IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-146

Filed: 5 July 2017

Guilford County, Nos. 14 JT 380-383, 15 JT 11-12

IN THE MATTER OF:

A.L.L., R.J.M., R.A.M.,
A.O.Z., D.A.M., O.E.J.M.

Appeals by Respondents Father and Mother from an Order to Terminate

Parental Rights entered 14 November 2016 by Judge Betty J. Brown in Guilford

County District Court; appeal by Respondent Father from orders entered 4 June

2015, 17 December 2015 and 3 June 2016 by Judge Angela C. Foster in Guilford

County District Court. Heard in the Court of Appeals 5 June 2017.

*Mercedes O. Chut, for petitioner-appellee Guilford County Department of Health and Human Services.*

*Lopez Law Firm, by Daniel J. Melo, for guardian ad litem.*

*Miller & Audino, LLP, by Jeffrey L. Miller, for respondent-appellant father.*

*Assistant Appellate Defender J. Lee Gilliam, for respondent-appellant mother.*

INMAN, Judge.

A North Carolina court properly exercises jurisdiction over children living in

this state and alleged to be abused, neglected or dependent, even if the children were

previously the subject of custody orders and continuing jurisdiction by a foreign state

court, once the foreign court enters a facially valid order declining further jurisdiction.

Respondent-mother ("Mother") appeals from an order terminating her parental rights as to her minor children A.L.L. ("Abigail"), R.J.M. ("Riley"), R.A.M. ("Robert"), A.O.Z. ("Ava"), D.A.M. ("Diana"), and O.E.J.M. ("Oscar"); Respondent-father ("Father") appeals the same order terminating his parental rights as to Abigail, Riley, and Robert[1] and seeks certiorari review of three permanency planning orders entered on 4 June 2015, 17 December 2015, and 3 June 2016 (the "Permanency Orders"). Mother contends that the trial court erred in finding that the children were dependent and that Mother had failed to make reasonable progress in correcting the conditions that led to their removal, and argues the trial court abused its discretion in determining the termination of parental rights would be in the best interests of Riley and Robert. Father contends that the trial court lacked subject matter jurisdiction to terminate his parental rights to Abigail, Riley, and Robert, and, in his petition for certiorari, contends that the trial court's permanency planning orders failed to make the requisite findings of fact to support its adjudication of the children as neglected and dependent.

After careful review, we affirm.

## I. <u>Factual and Procedural History</u>

---

[1] Father is the biological parent of only Riley, Robert, and Abigail; the putative and unknown fathers of Ava, Diana, and Oscar did not appeal.

The evidence presented to the trial court tended to show the following:

Mother gave birth to Ava in Detroit, Michigan, on 4 January 2006. In 2007, Mother began a relationship with Father and, by the end of 2009, they had two children together, Robert and Riley, also born in Michigan. In the course of the parents' relationship, four reports were made to Michigan Child Protective Services for homelessness, domestic violence, substance abuse, and mental health issues; none of the reports resulted in intervention by the Michigan agency. Father was convicted at least three times for domestic violence, including two incidents involving Mother in 2007 and 2012; he was also convicted of concealed weapon offenses in 2003 and 2010.

Beyond domestic violence against Mother, Father also engaged in inappropriate physical disciplining of Ava and exposed the older three children to inappropriate sexual content. In August of 2012, Mother left Father and refused to allow him further contact with Robert and Riley; her departure rendered her and her children homeless. The next month, Mother gave birth to Abigail, appellants' third child in common, in Michigan.

Shortly after Abigail was born, on 31 October 2012, Mother filed a child support and custody action against Father as to Riley and Robert in the Circuit Court for Wayne County, Michigan (the "Michigan Action"). During the pendency of the Michigan Action and while the children were in Mother's custody, three more reports

were made to Michigan Child Protective Services for neglect, physical abuse, and mental health issues; none of these reports resulted in intervention by the Michigan agency.

On 16 September 2013, the Michigan court awarded Mother sole legal and physical custody of Riley and Robert. Shortly after entry of the custody order in the Michigan Action, Mother fled the state with her four children to escape Father. Mother and the children settled in Guilford County, North Carolina.

Father filed a motion to modify the custody order in the Michigan Action on 4 October 2013. The Michigan court held an evidentiary hearing on Father's motion on 16 April 2014 with Father present and Mother participating by phone. The Michigan court found that Father had not established grounds to regain custody, but granted Father supervised visitation rights in Winston-Salem, North Carolina, at his own expense.

Father never exercised the visitation rights awarded by the Michigan court in 2014. He has not seen Robert or Riley since 2012, when Robert was four and Riley was three. He has never met Abigail, who is now five.

Shortly after moving to North Carolina, Mother obtained housing assistance from Petitioner-Appellee Guilford County Department of Health and Human Services ("DHHS"), which paid her rent for three months. However, Mother was evicted in the fourth month for her failure to pay rent. Following her eviction, Mother was again

living in homeless shelters with her children and became pregnant with twins by a third father in early 2014.

On 20 September 2014, DHHS received two reports concerning Mother, Abigail, Riley, Robert, and Ava. The reports indicated that Mother had slapped four-year-old Riley, resulting in charges of misdemeanor assault on a child under the age of twelve and misdemeanor child abuse. The reports also stated that Mother threatened to kill herself and her children. A mobile crisis unit evaluated Mother at the scene of the report. Mother was involuntarily committed to a local hospital for severe depression and suspected Post Traumatic Stress Disorder ("PTSD").

Two days later, DHHS filed a petition in Guilford County District Court alleging that Abigail, Riley, Robert, and Ava were abused, neglected, and dependent juveniles who should be removed from Mother's custody. DHHS was granted nonsecure custody as to all four children. The petition alleged that Mother "used cruel or grossly inappropriate devices or procedures to modify the behavior of a 4[-year old] child," that the children were living in an environment injurious to their welfare, that Mother could not provide proper care, supervision, or discipline, and that Mother could not arrange for appropriate alternative care for her children.

Mother was served with the petition on 25 September 2014 in open court during a hearing for continued nonsecure custody. Although DHHS personnel undertook diligent efforts prior to the hearing, they were unable to locate and serve

Father with the petition. An adjudicatory hearing was scheduled for 20 November 2014.

Pending the adjudicatory hearing, Mother and DHHS agreed to a case plan requiring her to undergo parenting, psychological, psychiatric, and substance abuse evaluations, to attend domestic violence counseling and parenting classes, and to secure stable housing. She was permitted visitation contingent upon a parenting/psychological evaluation and a meeting with DHHS personnel (termed a "TDM") consistent with the previously entered nonsecure custody orders. Consistent with the plan, Mother underwent all required evaluations between October and December 2014; she was diagnosed with Major Depressive Disorder, PTSD, and Alcohol Use Disorder. Mother's attendance at therapy and peer support programs was inconsistent, however, and she never enrolled in a group outpatient substance abuse program as recommended in her substance abuse evaluation.

On 12 November 2014, counsel for DHHS sent an email to District Court Judge Angela Foster notifying her of the custody order in the Michigan Action and noting the question of whether North Carolina could exercise jurisdiction over the children. Following a phone call with a judge in Michigan, Judge Foster called the adjudicatory hearing on the 20 November 2014 docket, but continued the hearing to allow the Michigan court time to enter an order relinquishing jurisdiction to North Carolina.

On 3 December 2014, following the telephone conference with Judge Foster, the Michigan court entered an order finding that "North Carolina is the more convenient and appropriate forum," and therefore the Michigan court declined and relinquished further jurisdiction over the custody actions concerning Riley, Robert, and Abigail to the North Carolina court.[2] The record does not indicate whether the Michigan court notified Father that it had relinquished jurisdiction to North Carolina.

The trial court held a pre-adjudication, adjudication and disposition hearing on 18 December 2014. Mother was present, as was a provisional attorney appointed by the court to represent Father's interests.[3] Mother consented to the adjudication of Abigail, Riley, Robert, and Ava as abused, dependent, and neglected. As memorialized by order filed 14 January 2015, the court acknowledged that the current plan for the four children was reunification, but found that Mother had not yet made sufficient progress on her case plan to order reunification.

---

[2] It is unclear, based on the orders in the record from the Michigan court, whether Abigail was ever made subject to the Michigan Action; in any event, the Michigan court relinquished jurisdiction with respect to Abigail, Riley, and Robert.

[3] Provisional counsel for Father was appointed pursuant to N.C. Gen. Stat. § 7B-1101.1 and consistent with the principle that "[p]arents have a right to counsel in all proceedings dedicated to the termination of parental rights." *In re L.C.*, 181 N.C. App. 278, 282, 638 S.E.2d 638, 641 (2007) (internal quotations omitted). There is no indication in the record that Father's provisional counsel was able to locate Father.

On 30 January 2015, Mother delivered twins Diana and Oscar. DHHS filed juvenile petitions as to the twins alleging the newborn twins were neglected and dependent on the basis of the DHHS reports and criminal charges from September 2014 and the ongoing custody proceedings relating to Abigail, Riley, Robert, and Ava.[4]

DHHS personnel, Mother, Mother's therapists, and therapists for the children met concerning visitation on 11 February 2015. It was revealed at the meeting that Mother was not fully participating in therapy. As a result, the therapists recommended against visitation until Mother was more "fully engaged" in therapy and until recommended by the children's therapists.

The trial court held a 90-day review hearing concerning Abigail, Riley, Robert, and Ava on 12 March 2015. Counsel for Mother and provisional counsel for Father were present. DHHS personnel, despite diligent efforts to contact Father prior to the hearing, failed to locate and serve Father with notice of the hearing. Because Father had not been served with the juvenile petition or notice of any hearing, the provisional attorney for Father was released. The trial court acknowledged during the hearing that reunification remained the plan for the children, but found that Mother had not yet made sufficient progress as planned in her service agreement with DHHS.

---

[4] Diana and Oscar were both adjudicated neglected and abused by consent of Mother, and the court ordered that reunification efforts cease at the same time it ordered that such efforts cease with respect to the other children. A recitation of the facts concerning the twins is not needed for disposition of this appeal, as Father's appeal concerns Abigail, Riley, and Robert only, and Mother's appellate brief asserts no specific argument regarding Diana or Oscar.

The trial court held a permanency planning review on 7 May 2015. Neither Father nor counsel representing Father attended the hearing, and there is no indication that Father had received notice of the hearing. Mother attended the hearing with her live-in boyfriend, who had a criminal history of domestic violence. Following the presentation of testimony and other evidence, DHHS and the children's guardian ad litem recommended changing the plan from reunification to adoption in large part due to Mother's refusal to take public housing in favor of living with a man with a history of domestic violence against the recommendation of therapists, DHHS and the trial court, and despite her enrollment in a domestic violence education program. The trial court entered an order on 4 June 2015 changing the plan from reunification to adoption.

Mother continued to live with her boyfriend until August 2015, when she moved to Charlotte, North Carolina without informing DHHS. Mother's compliance with the DHHS case plan further declined following her move. She had ceased therapy in June 2015, and her enrollment in parenting classes was terminated for failure to cooperate with the program provider.

DHHS continued its efforts to locate Father, and in September 2015 found him living in Warren, Michigan. Father contacted DHHS for the first time on 9 September 2015, more than a year after the Michigan court had relinquished jurisdiction over the children to North Carolina. He stated that he loved his children,

was unemployed and living with his sister, and disputed the facts of one of his domestic violence convictions.

Father called DHHS again on 14 September 2015, and learned that he would have to agree to a case plan with DHHS in order to reunify with his children, with visitation permitted only on the advice of the children's therapists. During the call, Father acknowledged to DHHS personnel that he had used marijuana one week prior and had been placed on probation for domestic violence against Mother while they were together in Michigan. A month after the call, DNA testing confirmed Father's paternity of Riley, Robert, and Abigail, and Father agreed to undergo a home study to facilitate reunification.

The trial court appointed an attorney for Father on 24 September 2015.

The trial court held another permanency planning review hearing on 19 November 2015. Mother and her attorney were present, as was Father's attorney. The trial court considered sworn testimony and written evidence, including a DHHS summary report identifying Father's lack of stable employment, lack of stable housing, lack of a bond with the children, illegal substance use, and domestic violence convictions as barriers to reunification. DHHS recommended that Father enter into a case plan if he wished to pursue reunification. Father's attorney requested a concurrent plan for reunification and that DHHS make reasonable efforts to assist Father. The trial court rejected that request based in part on Father's lack of a bond

with the children. However, the court ordered that Father enter into a case plan with DHHS should he desire reunification. The court concluded that the primary permanent plan of adoption and termination of parental rights as to both Mother and Father remained in the best interests of the children and declined to disturb its 4 June 2015 order.

There is no indication in the record that Father or his attorney initiated contact with DHHS to develop a case plan for reunification following the hearing.

A third permanency planning review hearing was held on 10 March 2016. Mother and her attorney were present, as was Father's attorney. The trial court again received sworn testimony and written evidence in the form of court summaries from DHHS, the Guardian ad Litem, and Michigan DHHS.

A home study report by Michigan DHHS concerning Father's living arrangements concluded that there was no room in the home for Father, let alone children, and that the environment was not stable. The study also reported that Father had received no unemployment benefits for two months, and his only income was doing odd jobs. As a result, Michigan DHHS recommended against placement of the children with Father. Following notification of the home study results, Father stated he changed his living arrangements and moved in with his brother.

As for Mother, documentary evidence was introduced showing she had sought therapy and medication management for mental health issues from providers in

Charlotte, although she had stopped attending both in November 2015. Despite her move to Charlotte, Mother remained in a romantic relationship with the boyfriend previously convicted of domestic violence offenses. DHHS recommended that adoption remain the primary placement plan with guardianship as the secondary plan, but also recommended that Father enter into and comply with a DHHS case plan in order to pursue reunification. The trial court took the matter under advisement.

On 23 March 2016, six months after Father was located by DHHS, in a telephone conference with his attorney and DHHS personnel, Father agreed in principle to a service agreement. On the call, Father acknowledged that he had choked Mother in 2012, but denied attempting to stab her.

Twelve days later, on 4 April 2016, before Father's service agreement was finalized, DHHS filed verified petitions to terminate Father's and Mother's parental rights. DHHS alleged in both petitions that termination of parental rights was appropriate for neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2015), willfully leaving the children in foster care for 12 months without reasonable progress under § 7B-1111(a)(2), willful failure to pay a reasonable portion of cost of care pursuant to § 7B-1111(a)(3), and incapability of providing care and supervision under § 7B-1111(a)(6).

Mother and Father were served with their respective petitions by certified mail on 11 and 14 April 2016, and both were served again personally on 21 April 2016.[5]

On 3 June 2016, the trial court entered an order—ruling on the issues it took under advisement in the March permanency planning hearing—concluding that adoption should remain the primary permanent plan. The court again ordered Father and DHHS to enter into a service agreement if Father wanted to seek reunification. Without referring directly to the petitions to terminate Mother's and Father's parental rights, the order required DHHS to continue pursuing termination.

The trial court heard evidence and argument on the petitions to terminate Mother's and Father's parental rights on 1-2 August 2016. Father did not attend the hearing; his attorney moved to allow him to appear via telephone because he was unable to attend in person. DHHS counsel objected on the grounds that Father's identity could not be verified via telephone and the hearing had been previously rescheduled for the explicit purpose of permitting Father to appear in person. The court denied Father's motion. DHHS voluntarily dismissed without prejudice its allegation that Father was incapable of caring for the children.

In the adjudicatory phase of the hearing, the trial court took judicial notice of the contents of the court file and heard testimony from Mother, a social worker

---

[5] Although Father had previously represented to DHHS that he had moved out of the home that had failed the home study in early 2016, he was served at that address by sheriff and certified mail on two separate dates.

assigned to the children, and an unlicensed "Peer Support Specialist" assisting Mother. The trial court found that DHHS had established by "clear, cogent, and convincing evidence" grounds to terminate Mother's and Father's parental rights.

In the dispositional phase, the trial court received the report of the guardian ad litem and heard testimony from the guardian ad litem program supervisor. The court determined that termination of parental rights was in the best interest of each of the children. The trial court's written order, entered 14 November 2016, concluded that grounds existed to terminate Mother's parental rights under N.C. Gen. Stat. §§ 7B-1111(a)(1) [abuse or neglect], (2) [lack of reasonable progress to correct conditions that led to petition], (3) [failure to pay for juvenile's cost of care], and (6) [incapability and dependency], to terminate Father's rights under N.C. Gen. Stat. §§ 7B-1111(a)(1) and (3), and that termination of parental rights was in the best interests of the children.

Mother and Father appealed. Father also seeks certiorari review of the three Permanency Orders, having failed to identify them in his Notice of Appeal or state them in his Proposed Issues for Review on Appeal consistent with N.C. Gen. Stat. § 7B-1001(5)(a)(3).

## II. <u>Analysis</u>

### A. Father's Appeal

Father does not challenge any of the findings of fact or conclusions of law in the Termination Order. He contends, however, that the trial court lacked subject matter jurisdiction to determine his rights with respect to Riley, Robert, and Abigail and that the trial court violated his statutory rights to notice and due process. For reasons we will explain, we disagree.

### 1.     Subject-Matter Jurisdiction

North Carolina's Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), N.C. Gen. Stat. § 50A-101 *et seq.*, governs the district court's subject-matter jurisdiction in child custody disputes. A trial court's jurisdiction pursuant to the UCCJEA is reviewed *de novo*. *In re J.H.*, ___ N.C. App. ___, ___, 780 S.E.2d 228, 233 (2015).

Michigan and North Carolina have codified the UCCJEA in virtually identical terms. N.C. Gen. Stat. § 50A-101 *et seq.*; Mich. Comp. Laws § 722.1101 *et seq.* Although North Carolina's district courts have original and exclusive jurisdiction over juvenile abuse, neglect, and dependency cases under N.C. Gen. Stat. § 7B-200(a), "the jurisdictional requirements of the UCCJEA . . . must also be satisfied for the court to have authority to adjudicate petitions filed pursuant to our juvenile code." *In re J.W.S.*, 194 N.C. App. 439, 446, 669 S.E.2d 850, 854 (2008) (citing *In re Brode*, 151 N.C. App. 690, 566 S.E.2d 858 (2002)). The UCCJEA recognizes four modes of subject-matter jurisdiction: (1) initial child-custody jurisdiction, N.C. Gen. Stat. §

50A-201; (2) exclusive, continuing jurisdiction, N.C. Gen. Stat. § 50A-202; (3) jurisdiction to modify determination, N.C. Gen. Stat. § 50A-203; and (4) temporary emergency jurisdiction, N.C. Gen. Stat. § 50A-204.

Temporary emergency jurisdiction exists "if the child is present in this State and . . . it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." N.C. Gen. Stat. § 50A-204(a). "A North Carolina court that does not have jurisdiction under N.C. Gen. Stat. §§ 50A-201 or 50A-203 has temporary emergency jurisdiction . . . ." *J.W.S.*, 194 N.C. App. at 449, 669 S.E.2d at 856. A district court need not make findings of fact to exercise temporary emergency subject matter jurisdiction, *In re E.X.J.*, 191 N.C. App. 34, 40-41, 662 S.E.2d 24, 27-28 (2008), *aff'd per curiam*, 363 N.C. 9, 672 S.E.2d 19 (2009), and the entry of nonsecure custody orders is permitted thereunder provided the terms of § 50A-204(a) are satisfied. *In re J.H.*, ___ N.C. App. at ___, 780 S.E.2d at 237. Once a court exercising temporary emergency jurisdiction learns of a custody determination made in another state, however, it must communicate with the other state's court to resolve subject matter jurisdiction going forward because the other state exercises exclusive and continuing jurisdiction as a result of its prior order. N.C. Gen. Stat. §§ 50A-202, 50A-204, & 50A-110.

There is no dispute that the trial court had temporary emergency jurisdiction to enter nonsecure custody orders with respect to Riley, Robert, and Abigail: DHHS sought and procured the orders as a result of Mother's threats to kill herself and her children. But because the Michigan Action included a custody determination as to the juveniles,[6] the trial court could obtain subject matter jurisdiction over them only if North Carolina would otherwise have initial child custody jurisdiction under N.C. Gen. Stat. § 50A-201(a)(1) or (2) and if :

> (1) The court of the other state [Michigan] determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207; or

> (2) A court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

N.C. Gen. Stat. § 50A-203(a). N.C. Gen. Stat. § 50A-201(a)(1) provides for initial custody jurisdiction if "[t]his State is the home state of the child on the date of the commencement of the proceeding . . . ." The statute defines "home state" as that "in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child-custody proceeding," *id.* § 50A-102(7), and we

---

[6] Again, it is unclear from the record whether the Michigan Action included Abigail. Mother's petition for custody which initiated the Michigan Action did not mention Abigail, who was just one month old at that time. However, the Michigan court entered an order relinquishing jurisdiction with regard to Riley, Robert, and Abigail.

determine a child's home state jurisdiction based on the physical location of a child and their parent. *In re K.U.-S.G.*, 208 N.C. App. 128, 134, 702 S.E.2d 103, 107 (2010). If a parent and her children are subject to the continuing and exclusive jurisdiction of another state's custody order, our courts acquire jurisdiction if the other state's court relinquishes jurisdiction consistent with N.C. Gen. Stat. § 50A-203(a) and if North Carolina is the children's "home state" as defined in N.C. Gen. Stat. § 50A-201(a)(1). *See also In re J.H*, __ N.C. App. __, __, 780 S.E.2d 228, 235-36 (2015) (applying this analysis to a North Carolina order modifying a Texas custody order).

Abigail, Riley, Robert, and Mother lived in North Carolina for more than a year prior to the trial court's hearing on pre-adjudication, adjudication, and disposition on 18 December 2014. Thus, North Carolina would qualify as the "home state" for the juveniles pursuant to N.C. Gen. Stat. § 50A-201(a)(1) and would have acquired initial custody jurisdiction but for the Michigan Action. Once the Michigan court determined North Carolina would be a more convenient forum and relinquished jurisdiction over the three children, the district court could assert jurisdiction under N.C. Gen. Stat. § 50A-203.

We will not disturb the trial court's assertion of jurisdiction based upon a facially valid order from another state ceding jurisdiction to this State. *See, e.g., In re T.R.*, ___ N.C. App. ___, ___, 792 S.E.2d 197, 201 (2016) ("Nothing in the UCCJEA requires North Carolina's district courts to undertake a collateral review of a facially

valid order from a sister state before exercising jurisdiction pursuant to N.C. Gen. Stat. § 50A-203(1).") (citation omitted).

## 2. Notice and Due Process

Father raises the issue of notice and due process in several contexts relating to the UCCJEA,[7] asserting that "[t]he UCCJEA is clear that notice and a meaningful opportunity to participate in the jurisdictional decision are mandatory before jurisdiction can be relinquished."  Father also argues "[t]he UCCJEA . . . requires that before a court determines it is an inconvenient forum . . . , it <u>must</u> allow the parties to submit information on the relevant factors the court must consider." (emphasis in original).  Father's argument is misplaced.

It was the Michigan court that determined it should relinquish jurisdiction to North Carolina, as is contemplated by the statute: "the original decree state is the sole determinant of whether jurisdiction continues." Official Comment to N.C. Gen. Stat. § 50A-202.  To the extent that Father's due process rights were frustrated or denied, they were denied in Michigan, not North Carolina.

Father also argues that the UCCJEA and the North Carolina Juvenile Code required notice to him in order for the trial court to assert subject matter jurisdiction

---

[7] To the extent that Father contends his Constitutional rights to due process were violated prior to the termination hearing, we note that he was served with process and represented by counsel in the termination hearing and failed to raise any such arguments.  Such arguments not raised at a termination hearing may not be raised for the first time on appeal. *In re T.P.*, 217 N.C. App. 181, 186, 718 S.E.2d 716, 719 (2011).

following its nonsecure custody orders and before the hearing adjudicating the children abused, neglected, and dependent, as he was never served with the juvenile petitions prior to said hearing. We have previously held, however, that "there is no legal basis for the . . . suggestion that the trial court lacked jurisdiction in the termination of parental rights proceeding because the father was not served with a summons in the initial adjudication proceeding." *E.X.J.*, 191 N.C. App. at 45, 662 S.E.2d at 31. The lack of service on Father prior to earlier custody and adjudication proceedings does not defeat the valid service and notice provided him for the termination hearing.

### 3. Petition for Writ of Certiorari

Father's petition for certiorari challenging the trial court's three permanency orders argues there was insufficient evidence to support findings ceasing reunification efforts and further asserts that the trial court failed to make findings of fact required by N.C. Gen. Stat. §§ 7B-906.1 & 7B-906.2. But the Termination Order included findings—unchallenged by Father—that support cessation of reunification efforts, and the contents of termination orders cure defects in a prior permanency planning order. *In re L.M.T.*, 367 N.C. 165, 170, 752 S.E.2d 453, 456-57 (2013). *See also In re D.C.*, 236 N.C. App. 287, 292, 763 S.E.2d 314, 317-18 (2014) (concluding inadequate findings to support cessation of reunification efforts in a permanency planning order were cured by a later termination of parental rights order that "made

additional detailed findings of fact . . . continuing up to the time of the hearing on termination of parental rights."). We also note that Father has failed to include the transcripts of the permanency planning hearings or request their inclusion via a motion to this Court pursuant to N.C. R. App. P. 9(b)(5)(b); we are obligated by the absence of the transcripts to consider the court's findings at those hearings as supported by competent evidence. *See Stone v. Stone*, 181 N.C. App. 688, 691, 640 S.E.2d 826, 828 (2007). We therefore deny Father's petition in our discretion.

## B. Mother's Appeal

By the plain text of the statute, termination of parental rights is permitted upon a finding of any *one* ground enumerated in N.C. Gen. Stat. § 7B-1111(a). The trial court in this action found four grounds existed as to Mother: (1) dependency; (2) abuse or neglect; (3) Mother's lack of reasonable progress to correct conditions that led to DHHS' petitions for custody; and (4) Mother's failure to pay for the cost of her children's care. Appellant challenges each of these grounds. However, because the trial court's findings were based on clear, cogent, and convincing evidence of dependency as defined in N.C. Gen. Stat. § 7B-1111(a)(6), we uphold the order terminating Mother's parental rights and do not reach her challenges regarding the other three grounds.

In reviewing findings of fact in a termination of parental rights order, we must determine "whether the trial court's findings of fact are based upon clear, cogent, and

convincing evidence . . . ." *In re I.T.P-L.*, 194 N.C. App. 453, 461, 670 S.E.2d 282, 287 (2008) (citation omitted). If clear, cogent, and convincing evidence is present in the record to support a finding, it will not be disturbed, even in the face of evidence to the contrary. *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). Legal conclusions drawn from the court's factual findings are reviewed *de novo. In re S.N.*, 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008). As for a determination by the trial court that termination is in the best interests of the child, we review for abuse of discretion where it is "manifestly unsupported by reason." *In re J.A.A.*, 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005).

Mother's sole challenge to the trial court's order finding the children dependent disputes a detailed finding of her history of mental illness and inconsistent treatment. Mother cites the lack of evidence showing the status of her mental health at the time of her hearing and points to the trial testimony of an unlicensed "Peer Support Specialist" that Mother's mental health had improved. As a result, Mother argues, "DHHS did not prove by clear and convincing evidence that the condition still rendered her incapable of parenting . . . ."

"[I]t [is] the trial court's responsibility to weigh the conflicting testimony and make appropriate findings of fact." *In re J.C.*, 236 N.C. App. 558, 562, 783 S.E.2d 202, 205 (2014). Here, there was ample documentary evidence and sworn testimony from a DHHS social worker from which the trial court could resolve any conflicting

testimony by the Peer Support Specialist. While it is true that the last clinical assessment of Mother was approximately a year prior to the termination hearing, we have previously held that a psychological evaluation conducted a year prior to a termination hearing can support the termination of parental rights where "the persistence of her personality problems characterized in her psychological evaluation as 'not easily amenable to change[,]' together with her lack of mental health treatment, constituted clear, cogent, and convincing evidence that her mental health problems had not changed significantly since the evaluation." *In re V.L.B.*, 168 N.C. App. 679, 685, 608 S.E.2d 787, 791 (2005). This was so irrespective of recent therapy. *Id.* at 685, 608 S.E.2d at 791.

The record here is sufficiently analogous to *V.L.B.* Mother's initial mental health assessment in October 2014 indicated that she suffered from recurring severe depression and PTSD. An assessment by a licensed psychologist two months later stated:

> [U]ntil she has better control over her depression and emotional neediness, she will continue to place herself and her children at risk for further harm. . . . [Mother] will need assistance. . . . At present, she is ill equipped emotionally and cognitively to accomplish [her treatment] goals independent of ongoing support, guidance, and therapy. . . . She needs medication to address her depressive symptomatology. And . . . she needs therapy to help her develop more effective coping strategies. . . .

Mother did not follow these recommendations. A year later, another mental health

- 23 -

assessment indicated Mother continued to suffer from these same conditions and again recommended therapy. Following the second recommendation and prior to the termination hearing, Mother still did not participate in therapy, but instead misrepresented the status of her treatment to DHHS. Mother's longstanding mental health conditions and her repeated failures to follow recommendations for treatment necessary to care for her children safely constituted clear, cogent, and convincing evidence to support the trial court's findings of dependency.

Mother next contends that the trial court abused its discretion in determining that termination of her parental rights would be in the best interests of Robert and Riley.[8] Mother challenges the findings that their likelihood of adoption remains high, that Robert is showing "great improvement" in foster care, and that Riley is in "a loving, nurturing, and safe environment." However, documentary evidence produced by the children's guardian ad litem notes that "[w]ith therapy, this GAL believes [Robert and Riley] will be able to be adopted. . . . [Robert] has a respectable bond with [redacted],[9] his caretaker. . . . [Robert] told this GAL he likes living with [redacted]." Further, the guardian ad litem supervisor testified at trial that "with the continuation of appropriate therapies, I believe that [Robert and Riley] will be adoptable," and that they had developed positive bonds with their caretakers. In light

---

[8] Mother concedes that the trial court did not err in concluding that termination of parental rights was in the best interests of the other minors.

[9] The name of Robert's caretaker has been removed to protect his privacy.

of this evidence, we cannot hold that the challenged findings were manifestly unsupported by reason.

Mother also contends that the likelihood of adoptability is low given Robert's and Riley's past behavioral problems and urges us to follow our decision in *In re J.A.O.*, 166 N.C. App. 222, 601 S.E.2d 226 (2004). That decision is inapposite. The teenage juvenile in *J.A.O.* had been in foster care for fourteen years, transferred caretakers nineteen times, lacked sufficient support, had a history of physical and verbal aggression, and suffered from a total of six medical conditions, both physical and mental. 166 N.C. App. at 227-28, 601 S.E.2d at 230. Indeed, the guardian ad litem in that case urged *against* adoption, and the mother "had made reasonable progress to correct the conditions that led to the petition to terminate her parental rights." *Id.* at 224-25, 601 S.E.2d at 228-29.

Finally, Mother contends that the trial court's failure to make detailed findings concerning Robert and Riley's behavioral issues runs afoul of the "[a]ny relevant consideration" language of N.C. Gen. Stat. § 7B-1110(a)(6). However, the order does contain a finding addressing this behavior, stating that "[t]hey have behavioral issues related to the trauma they experienced prior to removal. With continued therapeutic treatment, the likelihood of their adoption remains high." Further, " '[t]he trial court is not required to make findings of fact on all the evidence presented, nor state every option it considered' in arriving at its disposition under N.C. Gen. Stat. § 7B-1110."

*In re D.LW.*, 241 N.C. App. 32, 43, 773 S.E.2d 504, 511 (2015), *reversed in part on separate grounds*, 368 N.C. 835, 788 S.E.2d 162 (2016) (quoting *In re J.A.A.*, 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005)).  Mother's argument on this point is overruled. As a result, we hold the trial court did not abuse its discretion in finding termination of Mother's parental rights was in the best interests of Robert and Riley.

## IV. Conclusion

We hold that the district court properly exercised subject-matter jurisdiction regarding Father's parental rights on a temporary emergency basis and, once Michigan released continuing and exclusive jurisdiction over Father's children, under jurisdiction to modify a foreign court's determination.  We further hold that despite Father's lack of notice of the initial custody proceedings, he was not denied due process in the termination proceeding because he was properly served with the petition and was represented by counsel in the proceeding.  Finally, we hold that the district court did not err in its adjudication of the children or in its termination of Father's and Mother's parental rights.

AFFIRMED.

Chief Judge MCGEE and Judge TYSON concur.