IN THE COURT OF APPEALS OF NORTH CAROLINA

Nos. COA23-625, COA23-790

Filed 5 March 2024

Cumberland County, No. 21 JA 351

IN THE MATTER OF: R.G.

Consolidated appeals by respondent-mother from orders entered 30 December 2022 and 25 May 2023 by Judges Adam Phillips and Rosalyn Hood in District Court, Cumberland County. Heard in the Court of Appeals 15 February 2024.

*Dawn M. Oxendine for petitioner-appellee Cumberland County Department of Social Services.*

*Matthew D. Wunsche for guardian ad litem.*

*Parent Defender Wendy C. Sotolongo, by Deputy Parent Defender Annick Lenoir-Peek, for respondent-appellant mother.*

*No brief for respondent-appellee father.*

ARROWOOD, Judge.

Respondent-mother ("Mother") appeals from two permanency planning orders which (1) set a primary permanent plan of guardianship with concurrent secondary plans of custody with a relative and reunification with respondent-father ("Father") for her minor child, R.G. ("Riley"),[1] and (2) awarded guardianship of Riley to her

---

[1] The juvenile is referred to by a stipulated pseudonym to protect her identity and for ease of reading.

maternal grandmother. Mother asserts identical arguments in both appeals that "[t]he trial court lacked [subject matter] jurisdiction to enter anything other than emergency custody orders . . . [because] it violated the UCCJEA." For the reasons below, Mother's first appeal is dismissed and the court's orders that are the subject of Mother's second appeal are affirmed.

## I.     Background

Mother is Riley's biological aunt, and in November 2018 Mother and Father adopted Riley. Mother and Riley have resided in North Carolina since Riley was adopted, but at some point between Riley's adoption in November 2018 and May 2019 Father relocated to New York. After Father relocated to New York a custody dispute arose, and on or about 3 September 2019 the Herkimer County, New York Family Court entered an "Order of Custody and Visitation" ("New York Order") that, *inter alia*,[2] granted Mother and Father joint legal custody and Mother primary physical custody of Riley.

On 22 December 2021, the Cumberland County Department of Social Services ("DSS") took nonsecure custody of Riley and filed a juvenile petition ("Petition") alleging Riley was an abused and neglected juvenile, based on allegations that Riley

---

[2] The New York proceeding also addressed custody of Mother and Father's other children, who were not the subject of this juvenile case.

was sexually abused by a man ("Caretaker")[3] living with Mother. The Petition alleged Riley "consistently disclosed" abuse by Caretaker, and that as a result Caretaker was charged with several felony sex offenses. The Petition further alleged that Caretaker had previously abused another minor child. However, after Mother was made aware of Caretaker's abuse of Riley and the other minor child, Mother made no attempt to protect Riley and continued to cohabitate with Caretaker.

Between January and March 2022, the trial court entered five orders continuing nonsecure custody with DSS. These orders found that DSS placed Riley with her maternal grandmother, Riley was doing well in this placement, that the Petition alleged abuse that necessitated Riley's removal from Mother's home, and that the allegations in the Petition justified DSS retaining nonsecure custody in order to protect Riley.

On 26 April 2022, Mother filed two petitions to register and enforce the New York Order under North Carolina's codification of the Uniform Child-Custody Jurisdiction and Enforcement Act ("UCCJEA"). Mother's petition to enforce the New York Order asserted (1) New York was Riley's home state pursuant to the UCCJEA; (2) the New York Order had not been vacated, stayed, or modified by any court; and (3) the New York Order had been confirmed by the Herkimer County Family Court.

---

[3] The Petition does not clearly identify the relationship between Mother and this man, other than they lived together in Mother's home. This man is referred to by the same pseudonym used by the trial court.

Mother requested the court dismiss the Petition because DSS willfully omitted the New York Order from the Petition and took no action to validate the New York Order before filing the Petition; therefore, the Petition was "not properly validated[.]"

On 28 April 2022, based on a 23 March 2022 hearing, the trial court entered another order on nonsecure custody and a pre-adjudication conference that makes similar findings to the other orders on nonsecure custody. This order does not refer to Mother's petitions to enforce the New York Order.

On 4 May 2022, the trial court stayed Mother's petitions to enforce the New York Order because the court was exercising its exclusive juvenile jurisdiction under Chapter 7B of the General Statutes.

On 18 May 2022, based on a 20 April 2022 hearing, the trial court entered another order on continued nonsecure custody finding Mother had "notified the Court that she contests the Court's subject matter jurisdiction." "The Court informed Respondent Mother that even if jurisdiction was an issue it would be exercising emergency jurisdiction until jurisdiction could be resolved at the appropriate hearing and that, as this was a hearing on the need for continued nonsecure custody, no arguments would be heard[.]"

On 27 May 2022, the trial court filed a letter from the trial court to a Herkimer County, New York judge, Judge Luke, requesting a UCCJEA conference. The letter notified Judge Luke that DSS had filed the Petition and that the trial court was exercising temporary emergency jurisdiction.

On 10 June 2022, based on a 17 May 2022 hearing, the trial court entered an order finding that "[DSS] is exercising emergency jurisdiction until jurisdiction could be resolved at the Judicial Settlement Conference on May 26, 2022." The court then made findings consistent with prior orders, and continued the juvenile case.

On 13 June 2022, the court filed a return letter from Herkimer County Family Court Judge Luke. The letter indicated a UCCJEA conference was held 9 June 2022, and that Judge Luke and the trial court agreed that North Carolina had jurisdiction over the juvenile proceeding. Judge Luke reviewed the court file for the New York custody case and determined (1) that Mother and Riley lived in North Carolina when the New York Order was entered; (2) there were no other New York proceedings as to the New York custody case; and (3) there were "no known connections between the allegations [in the Petition] and New York . . . that would confer jurisdiction to New York." The trial court thereafter entered four more orders on continued nonsecure custody, which found, *inter alia*, that "the subject matter jurisdiction issue was resolved[,]" as confirmed by Judge Luke's letter to the trial court.

On 1 November 2022, the trial court entered an adjudication and initial disposition order ("ADO"). The court found Mother had attempted to enforce the New York Order, but that per Judge Luke's letter "New York no longer has grounds for continuing exclusive jurisdiction and otherwise declined to exercise jurisdiction." The trial court found all parties were aware of Judge Luke's letter, "and none of the parties presented evidence or arguments to contest jurisdiction when given the

opportunity to do so at today's preliminary hearing, nor have they raised the issue at any prior hearing since the communication." The court also found there were no pending proceedings in New York concerning Riley, "North Carolina is a more convenient forum and New York ha[d] declined to exercise jurisdiction, [and] therefore th[e] court ha[d] authority to modify the" New York Order. The trial court then adjudicated Riley abused and neglected for the reasons stated in the Petition, *i.e.*, that Caretaker sexually abused Riley and Mother took no action to protect Riley after becoming aware of the abuse.

The trial court then made dispositional findings that Riley was still living with her maternal grandmother and was doing well in that placement. The trial court also recounted Caretaker's abuse of Riley and Mother's failure to protect Riley, and found Mother had taken no action toward relieving any conditions which led to Riley's removal from the home. Based on these findings, the trial court concluded that "[p]er N.C. Gen. Stat. § 7B-901(c)(1), . . . aggravated circumstances exist because Respondent Mother . . . has allowed the continuation of sexual abuse upon the juvenile and has committed other acts that increased the enormity and added to the injurious consequences of the abuse or neglect." "Pursuant to N.C. Gen. Stat. § 7B-901(c)," the trial court ceased reunification efforts between Mother and Riley.

On 30 December 2022, the trial court entered an initial permanency planning order setting permanent plans for Riley ("Initial PPO"). The court found *inter alia,* that DSS was relieved of reunification efforts with Mother in the ADO due to

aggravated circumstances and decreed that "[r]eunification with Respondent Mother remains eliminated from the permanent plans." The court set a primary permanent plan of guardianship with concurrent secondary permanent plans of custody with a relative and reunification with Father. Mother appealed from the Initial PPO.

On 25 May 2023, the trial court entered another permanency planning order which granted guardianship of Riley to Riley's grandmother ("Guardianship PPO"). Mother also appealed from the Guardianship PPO.

On 1 September 2023, Mother filed a Motion to Consolidate Appeals, which this Court allowed on 5 September 2023. On 29 September 2023, the guardian *ad litem* ("GAL") filed a "Motion to Dismiss Respondent Mother's Interlocutory Appeal" ("Motion to Dismiss"), (capitalization altered), asserting Mother has no right to appeal the Initial PPO. On 10 October 2023, Mother filed a Response to the Motion to Dismiss and a petition for writ of certiorari.

## II. Mother's First Appeal (COA23-625)

Mother first appealed from the Initial PPO pursuant to N.C.G.S. § 7B-1001(a)(5), which grants a parent a right to appeal "[a]n order under G.S. 7B-906.2(b) eliminating reunification . . . as a permanent plan" for a juvenile. N.C.G.S. § 7B-1001(a)(5) (2021). The GAL argues that Mother has no right to appeal the Initial PPO "because reunification efforts were ceased in the [ADO] pursuant to N.C. Gen. Stat. § 7B-901(c) (2021), and reunification was, therefore, never part of the permanent plan by operation of N.C. Gen. Stat. § 7B-906.2(b) (2021)."

Mother did not have a right to appeal the Initial PPO pursuant to N.C.G.S. § 7B-1001(a)(5), because N.C.G.S. § 7B-906.2(b) operates to exclude reunification as a permanent plan once the trial court makes findings of aggravated factors under N.C.G.S. § 7B-901(c) at disposition. There is no required delay between the trial court's dispositional order and first permanency planning order for the court to eliminate reunification from the permanent plans for a juvenile after the trial court makes dispositional findings of the specific, statutorily prescribed circumstances under N.C.G.S. § 7B-901(c).

Mother's arguments are in part based on this Court's opinion in *In re C.P. See In re C.P.*, 258 N.C. App. 241 (2018). In *In re C.P.*, the respondent-mother argued the trial court lacked the authority to cease reunification efforts at an initial dispositional hearing; she specifically challenged the trial court's combined hearing and asserted the trial court was required to order reunification as a concurrent plan as part of the initial permanent plans. *See id.* at 244. This Court held the trial court erred by failing to order reunification as one of the initial plans for the juvenile. *See id.* At the time of the hearing, N.C.G.S. § 7B-906.2(b) read " '[a]t any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. *Reunification shall remain* a primary plan or secondary plan unless' certain findings are made." *Id.* at 244–45 (emphasis in original) (quoting N.C.G.S. § 7B-906.2(b) (2015)). The *In re C.P.* Court reasoned "[t]he statutory requirement that 'reunification shall remain' a plan presupposes the

existence of a prior concurrent plan which included reunification. Thus, reunification *must be part of an initial permanent plan.*" *Id.* at 245 (emphasis added).[4]

But this Court also concluded reunification efforts were a distinct, independent concept from reunification as a permanent plan. *See id.* The Court based this determination wholly on prior controlling precedent, which held "that a trial court can cease reunification efforts at the first permanency planning hearing if necessary findings of fact were made that showed reunification would be unsuccessful or not in the juvenile's interest." *Id.* (citing *In re H.L.*, 256 N.C. App. 450, 461–62 (2017)); *see also id.* at 245 n.3 (citing *In re Civil Penalty*, 324 N.C. 373, 384 (1989)). Ultimately, the Court's holdings created a two-step process where reunification must be part of an initial plan at an initial permanency planning hearing and can only be eliminated at a subsequent permanency planning hearing, regardless of whether reunification efforts were ceased at the first hearing. *See id.* at 244–45.

This Court later expressed reservations about the holdings in *In re C.P.* in *In re M.T.-L.Y. See In re M.T.-L.Y.*, 265 N.C. App. 454, 464–466 (2019). The *In re M.T.– L.Y.* Court identified a number of "anomalous results and consequences that raise more questions than answers going forward[,]" including the exact contours of a parent's right to appeal pursuant to N.C.G.S. § 7B-1001(a)(5), due to the "dichotomy

---

[4] Notably, the trial court in *In re C.P.* omitted a portion of N.C.G.S. § 7B-906.2 stating those "certain findings" may be findings made under N.C.G.S. § 7B-901(c). *See* N.C.G.S. § 7B-90.2(b) (2015). Regardless, the holding in *In re C.P.* indicates that, in all cases, reunification was to be part of the initial plans for a juvenile. *See In re C.P.*, 258 N.C. App. at 245.

between 'reunification' and 'reunification efforts'" and expressly "encourage[d] the North Carolina General Assembly to amend these statutes to clarify their limitations." *Id.* at 465–66.

The General Assembly has since amended N.C.G.S. § 7B-906.2(b) twice and clarified the limitations in the statutes governing permanency planning hearings. These changes also significantly undermine the rationale in *In re C.P.* that reunification must be part of the initial permanent plans for a juvenile and that reunification efforts and reunification as a permanent plan are disjoined concepts. First, in 2019, the General Assembly amended N.C.G.S. § 7B-906.2(b) to remove the word "remain." *See* 2019 N.C. Sess. Laws 2019-33, § 11. Where N.C.G.S. § 7B-906.2(b) used to read "[r]eunification *shall remain* a primary or secondary plan unless the court made findings under G.S. 7B-901(c)[,]" N.C.G.S. § 7B-906.2(b) (eff. 1 October 2015 to 30 September 2019), it was amended to read "[r]eunification *shall be* a primary or secondary plan unless the court made written findings under G.S. 7B-901(c)[.]" N.C.G.S. § 7B-906.2(b) (eff. 1 October 2019). The Court's reasoning in *In re C.P.* that the statutory language "reunification shall remain . . . presupposes the existence of a prior concurrent plan which included reunification" no longer applies given this change. *In re C.P.*, 258 N.C. App. at 245. The plain language of N.C.G.S. § 7B-906.2(b) now permits trial courts to exclude reunification from the permanent plans for a juvenile at any time, including immediately following disposition, and need not be a permanent plan for a juvenile, at all, *if findings were made* under

N.C.G.S. § 7B-901(c).  *See* N.C.G.S. § 7B-906.2(b).

Second, in 2021, the General Assembly again amended N.C.G.S. § 7B-906.2(b) to clarify the relationship between reunification efforts and reunification as a permanent plan.  *See* 2021 N.C. Sess. Laws 2021-100, § 11.  The version of N.C.G.S. § 7B-906.2(b) prior to this amendment stated the trial court could eliminate reunification if "the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. The finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health and safety may be made at any permanency planning hearing."  N.C.G.S. § 7B-906.2(b) (eff. 1 October 2019 to 30 September 2021). Additional language was added to the statute, and it now reads "[t]he finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing, *and if made, shall eliminate reunification as a plan*."  N.C.G.S. § 7B-906.2(b) (eff. 1 October 2021 to present).  This change clarifies that reunification efforts and reunification as a permanent plan are not distinct, decoupled concepts; the General Assembly has expressly directed, at least in that context, that the cessation of reunification efforts also eliminates reunification as a permanent plan.  There is no two-step process for eliminating reunification, and the trial court may both cease reunification efforts and eliminate reunification as a permanent plan at the initial permanency planning hearing by making a single finding that reunification efforts would be unsuccessful

- 11 -

given the facts and circumstances of the case.  *See* N.C.G.S. § 7B-906.2(b).

These statutory changes clarify that there is no presupposition that an initial permanency plan must require reunification.  Sections 7B-901(c) and 7B-906.2(b) operate together to allow the trial court to (1) cease reunification efforts at disposition, *see* N.C.G.S. § 7B-901(c), and (2) omit reunification from the permanent plans for a juvenile where the court has found aggravating factors under N.C.G.S. § 7B-901(c).  *See* N.C.G.S. § 7B-906.2(b).  Here, because the trial court made written findings under N.C.G.S. § 7B-901(c) in the ADO, reunification was excluded and omitted from the permanent plans for Riley beginning at disposition and was never eliminated as a permanent plan at the first permanency planning hearing.  Therefore, because Mother only had a right to appeal from "[a]n order under G.S. 7B-906.2(b) *eliminating* reunification . . . as a permanent plan[,]" she did not have a right to appeal the Initial PPO.  N.C.G.S. § 7B-1001(a)(5) (emphasis added).

This interpretation is reinforced by the fact that Mother had the opportunity to contest the trial court's decision to cease reunification efforts and omit reunification as a permanent plan, including the court's findings under N.C.G.S. § 7B-901(c), because she had a separate and specific right to appeal the ADO and failed to do so.  *See* N.C.G.S. § 7B-1001(a)(3) (granting a right to appeal "[a]ny initial order of disposition and the adjudication order upon which it is based").  We see no reason why the General Assembly would allow Mother to appeal from the ADO and assert error under N.C.G.S. § 7B-901(c) then also appeal the Initial PPO and assert error

under § 7B-906.2(b) when any error under § 7B-906.2(b) in this context would be based on the same error Mother would have already had the opportunity to contest. Mother's interpretation of Chapter 7B would grant a respondent a proverbial second bite at the apple to appeal multiple orders and assert substantially the same argument when the court omits reunification as a permanent plan.

For the reasons above, the GAL's Motion to Dismiss is allowed and Mother's first appeal, filed in this Court under No. COA23-625, is dismissed. Furthermore, Mother's petition for a writ of certiorari is denied for the reasons stated in her response to the Motion to Dismiss; Mother's second appeal raises an identical issue to her first appeal and this Court may reach the merits of Mother's argument below.

### III. Mother's Second Appeal (COA23-790)

We first note Mother's second appeal is a properly authorized appeal pursuant to N.C.G.S. § 7B-1001(a)(4) from an order changing custody of the juvenile. *See* N.C.G.S. § 7B-1001(a)(4). Mother asserts the trial court lacked jurisdiction under the UCCJEA to enter anything other than emergency custody orders because the court failed to comply with various provisions of the UCCJEA.

### A. Standard of Review

North Carolina's codification of the UCCJEA is applicable to juvenile cases and "governs the district court's subject-matter jurisdiction in child custody disputes. A trial court's jurisdiction pursuant to the UCCJEA is reviewed *de novo*." *In re A.L.L.*, 254 N.C. App. 252, 262 (2017) (citation omitted). This Court "presumes the trial court

has properly exercised jurisdiction unless the party challenging jurisdiction meets its burden of showing otherwise." *In re L.T.*, 374 N.C. 567, 569 (2020).

## B.    UCCJEA

North Carolina's version of the UCCJEA is codified in Chapter 50A, Article 2 of the General Statutes. "The UCCJEA recognizes four modes of subject-matter jurisdiction: (1) initial child-custody jurisdiction, N.C. Gen. Stat. § 50A-201; (2) exclusive, continuing jurisdiction, N.C. Gen. Stat. § 50A-202; (3) jurisdiction to modify determination, N.C. Gen. Stat. § 50A-203; and (4) temporary emergency jurisdiction, N.C. Gen. Stat. § 50A-204." *In re A.L.L.*, 254 N.C. App. at 262. The trial court has "temporary emergency jurisdiction if the child is present in this State and . . . it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." N.C.G.S. § 50A-204(a) (2021). "A North Carolina court that does not have jurisdiction under N.C. Gen. Stat. §§ 50A-201 or 50A-203 has temporary emergency jurisdiction[.]" *In re A.L.L.*, 254 N.C. App. at 262 (citation and quotation marks omitted). However, upon learning of a custody determination in another state, a court exercising temporary emergency jurisdiction "must communicate with the other state's court to resolve subject matter jurisdiction going forward because the other state exercises exclusive and continuing jurisdiction as a result of its prior order." *Id.* at 263 (citations omitted).

There is no dispute that the trial court had temporary emergency jurisdiction to enter the nonsecure custody orders to protect Riley; DSS sought the orders as a

result of alleged child sexual abuse and the trial court made findings that the orders were necessary to protect Riley. *See* N.C.G.S. § 50A-204(a). However, the New York Order set custody of Riley, and therefore the trial court could only modify the New York custody determination if the requirements of the UCCJEA regarding modification of another state's custody determination were met. *See* N.C.G.S. § 50A-203 (2021).

To modify a child custody determination made by a court of another state, a North Carolina court must have "jurisdiction to make an initial determination under G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2)" and the other state's court must "determine[ ] it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207[.]"[5] N.C.G.S. § 50A-203(1). Section 50A-201(a) in turn provides for initial custody jurisdiction if "[t]his State is the home state of the child on the date of the commencement of the proceeding[.]" N.C.G.S. § 50A-201(a)(1) (2021). The child's home state is "the state in which [the] child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child-custody proceeding." N.C.G.S. § 50A-102(7) (2021). North Carolina "determine[s] a child's home state jurisdiction based on the physical location of a child and their parent." *In re A.L.L.*, 254 N.C. App.

---

[5] A court of this State may also obtain jurisdiction to modify a child custody determination of another state if the child and their parents do not "presently reside in the other state." N.C.G.S. § 50A-203(2). However, because Father still lived in New York during this proceeding, this section is inapplicable.

at 263.

Mother asserts the trial court failed to comply with various provisions of the UCCJEA. Mother argues (1) the trial court failed to stay its simultaneous proceeding with New York as required by N.C.G.S. § 50A-206; (2) Mother was denied the right to be heard under N.C.G.S. § 50A-110(b) before the trial court made a determination on jurisdiction; (3) Judge Luke's letter was insufficient to relinquish jurisdiction to North Carolina under N.C.G.S. § 50A-203; and (4) the trial court incorrectly applied the factors under N.C.G.S. § 50A-207 when determining whether New York was an inconvenient forum. The GAL and DSS assert the trial court had jurisdiction because the court "took the action required by" the UCCJEA after the trial court "learned of a 2019 New York custody order, by contacting the New York Court, making a record of that contact, and acting only after receiving the New York court's written determination that North Carolina was a more convenient forum for the abuse and neglect case."

Here, we focus on Mother's third argument, because her remaining arguments are misplaced. As to simultaneous proceedings, the trial court is permitted to enter temporary emergency orders when necessary to protect a juvenile from "mistreatment or abuse." N.C.G.S. § 50A-204(a). Section 50A-206 specifically carves out an exception that allows the trial court to exercise temporary emergency jurisdiction even if there are simultaneous proceedings in two states. *See* N.C.G.S. § 50A-206. As noted above, the trial court was exercising temporary emergency

jurisdiction when it entered the nonsecure custody orders and in doing so did not violate N.C.G.S. § 50A-206.

As to Mother's right to be heard, Mother asserts she was entitled to "present facts and legal argument before a decision on jurisdiction [was] made." N.C.G.S. § 50A-110(b). The trial court exercised temporary emergency jurisdiction when entering the nonsecure custody orders up until a preliminary adjudicatory hearing, where it needed to make jurisdictional determination to modify New York's custody determination in the ADO. At the preliminary hearing, the trial court gave Mother an opportunity to contest jurisdiction and, although Mother was aware of Judge Luke's letter, she did not "present[ ] evidence or arguments to contest jurisdiction when given the opportunity to do so . . . nor [did] [she] raise[ ] the issue at any prior hearing since [Judge Luke's] communication." Instead, Mother discharged her attorney and abstained from the preliminary hearing "in what appear[ed] to be protest of th[e] Court proceeding." Mother was given an opportunity to present facts and legal arguments before the trial court exercised anything other than temporary emergency jurisdiction but refused to do so. The trial court did not violate N.C.G.S. § 50A-110(b).

As to the factors under N.C.G.S. § 50A-207, Mother's argument is misplaced. Mother argues the *New York* court failed to properly weigh the inconvenient forum factors and that the *North Carolina* trial court should have held an evidentiary hearing to weigh the factors. But under the UCCJEA, "the original decree state is

the sole determinant of whether jurisdiction continues[,]" *In re A.L.L.*, 254 N.C. App. at 265, and "nothing in the UCCJEA requires North Carolina's district courts to undertake collateral review of" another state's jurisdictional determination. *In re T.R.*, 250 N.C. App. 386, 391 (2016). To the extent Mother challenges New York's jurisdictional determination, her remedy lies in New York, not North Carolina.

Mother's only remaining argument is that Judge Luke's letter was insufficient, as a matter of law, to confer jurisdiction on the trial court and that the New York court could only relinquish jurisdiction by entry of a court order. This argument is focused on the second requirement of N.C.G.S. § 50A-203. The first requirement of N.C.G.S. § 50A-203 is clearly met because Riley has lived in North Carolina with Mother since 2018. North Carolina is Riley's "home state" within the meaning of the UCCJEA. *See* N.C.G.S. § 50A-102(7).

The UCCJEA and the official commentary to the UCCJEA contemplate the entry of an order from the state relinquishing jurisdiction before our district courts exercise jurisdiction to modify a child custody determination. *See* N.C.G.S. § 50A-204(c) ("[A]ny order issued by a court of this State under this section must specify in the order a period that the court considers adequate *to allow the person seeking an order to obtain an order* from the state having jurisdiction . . . . The order issued in this State remains in effect *until an order is obtained from the other state*[.]" (emphasis added)); N.C.G.S. § 50A-202 cmt. 1 (2021) ("A party seeking to modify a custody determination must obtain an order from the original decree State stating

that it no longer has jurisdiction."); N.C.G.S. § 50A-204 cmt. But, while the statutory language and commentary of the UCCJEA strongly indicate that a foreign state will be relinquishing jurisdiction via a court order, the UCCJEA does not expressly require that a state do so. Nor does the UCCJEA expressly state our courts can only exercise jurisdiction under N.C.G.S. § 50A-203 when the trial court has a foreign court order relinquishing jurisdiction in hand. The UCCJEA merely requires the foreign state to make a jurisdictional "determination" before our courts can modify that state's custody determination. *See* N.C.G.S. § 50A-203(1).

A review of this Court's precedent similarly indicates that our courts have generally looked for a foreign court order making one of the two determinations under N.C.G.S. § 50A-203 to determine whether the foreign court has relinquished jurisdiction under the UCCJEA. As a general trend, where such an order exists this Court considers jurisdiction to have been relinquished by the other state. *See In re A.L.L.*, 254 N.C. App. at 264 ("We will not disturb the trial court's assertion of jurisdiction based upon a facially valid order from another state ceding jurisdiction to this State."); *In re N.B.*, 240 N.C. App. 353, 358 (2015) ("The remaining jurisdictional requirement for a modification under the UCCJEA is satisfied by the New York Court's order relinquishing jurisdiction to the State of North Carolina." (citation and quotation marks omitted)). Where such orders are missing, this Court has concluded the trial court's orders must be vacated due to a lack of subject matter jurisdiction. *See In re N.R.M.*, 165 N.C. App. 294, 300 (2004) ("In the case before our

Court, there is no Arkansas order in the record stating that Arkansas no longer has jurisdiction."). However, this Court has never expressly held that a court order is the only method by which a sister state can relinquish jurisdiction over a child custody proceeding.

Furthermore, the parties note this trend is not absolute, and this Court has accepted a sufficiently trustworthy proxy for a court order relinquishing jurisdiction. In *In re T.R.*, this Court held an Illinois trial court's docket entry "was tantamount to a determination that North Carolina" was a more appropriate forum under N.C.G.S. § 50A-207 to satisfy the second requirement under N.C.G.S. § 50A-203. *In re T.R.*, 250 N.C. App. at 390. The Illinois trial court had not entered an order relinquishing jurisdiction to North Carolina, but the Illinois court did make a docket entry that:

> possesse[d] all of the substantive attributes of a court order. It reache[d] the conclusion that the case should be transferred from the courts of Illinois to the courts of North Carolina and fully explain[ed] its rationale for that conclusion. Moreover . . . there [was] no indication in the record . . . that Respondent did not receive a copy of the docket entry from the Illinois court or that Respondent made any effort to appeal [the court's] ruling.

*Id.* at 391.[6]

Here, Judge Luke's letter is analogous to the court's docket entry in *In re T.R.* Judge Luke wrote:

---

[6] This Court's opinion in *In re T.R.* was based, in part, on the fact that "[t]he Illinois Court of Appeals has accepted a docket sheet entry as an order of the court where there was no transcript of the hearing and no written order." *Id.* (citation and quotation marks omitted).

> As a result of our [UCCJEA] conference yesterday, I concur that Jurisdiction for the alleged child abuse and neglect proceedings is in the State of North Carolina and not in Herkimer County New York. I reviewed the file from a court proceeding in Herkimer County that occurred on August 29, 2019, and at that time [Mother], mother of [Riley] agreed to a Custody Order in which she would have custody of her daughter, [Riley]. This was done with the consent of the child's father, [Father]. Importantly, at the time of the agreement, [Mother] and her daughter lived in the State of North Carolina. There are no other Family Court proceedings in New York in this matter. Assuming [Mother] and her daughter continued to reside in North Carolina from the time [of] the Order until the allegations, it is apparent jurisdiction in North Carolina is proper. Finally, there are no known connections between the allegations and New York, witnesses or otherwise, that have been made known to me that would confer jurisdiction to New York.

Like the docket sheet in *In re T.R.*, Judge Luke's letter "reaches the conclusion that the case should be transferred from the courts of [New York] to the courts of North Carolina and fully explains its rationale for that conclusion." *Id.* Judge Luke laid out salient facts that supported his conclusion that jurisdiction lied in our courts, *i.e.*, that there were no connections between the allegations of the Petition and the previous New York custody case. *See id.* On its face, Judge Luke's letter contains the same "substantive attributes of a court order" identified in *In re T.R. Id.* at 391.

Mother attempts to distinguish the letter as an "unverified document[ ]" and mere informal "correspondence" that falls short of the docket entry in *In re T.R.* But Judge Luke's letter contains sufficient indicia of veracity and officiality that Mother's argument is not persuasive. Judge Luke's letter is in direct response to, and based

on, the trial court's requested UCCJEA conference. The letter is on "Family Court of the State of New York . . . County of Herkimer" letterhead. The letter recounts facts of the prior New York custody proceeding that are consistent with the New York Order in the record on appeal. Judge Luke signed the letter himself; it was not drafted by the clerk of court or another clerical employee. Additionally, Judge Luke is the sitting Family Court Judge for Herkimer County, New York, of which this Court takes notice. Finally, the trial court concluded the letter was sufficiently trustworthy that the court filed the letter upon receipt.

Additionally, our courts cannot dictate how a sister state relinquishes jurisdiction, and "[n]othing in the UCCJEA requires North Carolina's district courts to undertake collateral review of a facially valid order from a sister state before exercising jurisdiction pursuant to N.C. Gen. Stat. § 50A-203(1)." *In re T.R.*, 250 N.C. App. at 391, 792 S.E.2d at 201. While we acknowledge the better practice may be for a district court to enter a court order relinquishing jurisdiction over a child custody case, on the specific facts of this case we hold Judge Luke's letter was sufficient to relinquish jurisdiction over the child custody determination and allow the trial court to exercise jurisdiction pursuant to N.C.G.S. § 50A-203.

For the reasons above, the trial court complied with the relevant provisions of the UCCJEA and had jurisdiction to enter the ADO and subsequent orders.

### IV. Conclusion

Mother's appeal in COA23-625 from the Initial PPO is interlocutory and

dismissed. As to Mother's second appeal in COA 23-790, based on the specific facts of this case the trial court had subject matter jurisdiction over the Petition and to enter the challenged orders. The trial court's juvenile orders are affirmed.

COA23-625; DISMISSED.

COA23-790; AFFIRMED.

Chief Judge DILLON and Judge GRIFFIN concur.